**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KAREN D.,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | No. 24-cv-12282 |
| | ) | |
| v. | ) | |
| | ) | **Judge Jeffrey I. Cummings** |
| **BOARD OF EDUCATION OF THE CITY** | ) | |
| **OF CHICAGO,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

In their first amended complaint ("Complaint"), plaintiffs Karen D. and Michael A-B,

individually and as plenary co-guardians of plaintiff AAB, a disabled person (collectively,

"plaintiffs"), bring eighteen different federal and state claims against thirteen defendants related

to two incidents in November and December 2022 that occurred while AAB was being

transported by bus to his school.

In essence, plaintiffs allege that: (i) AAB—a developmentally disabled, non-verbal

teenager—was required to wear a full-body harness while riding the bus to school; (ii) on

November 30 and December 19, 2022, AAB unbuckled himself and exited his seat during the

bus rides because the harness caused him discomfort; (iii) defendant bus employees physically

abused AAB on both occasions; (iv) on December 19, after calling defendant Shavona McGregor

(an employee of defendant Board of Education of the City of Chicago), defendant bus employees

returned the bus to AAB's home despite not knowing whether AAB's parents were home instead

of taking AAB to school; and (v) defendant Chicago police officers responded to the scene of

AAB's home, took AAB into custody without probable cause, detained him until paramedics

1

arrived, and accompanied the paramedics as they transported AAB to Insight Hospital against AAB's will.

The Board of Education of the City of Chicago (the "Board"); its employee Shavona McGregor; the City of Chicago (the "City"); and Chicago police officers Heriberto Arzate, Ezequiel Bahena, Jack Hightower, Jeanne Mendez, Brian Gunnell, and Quantilda Peterson (collectively, the "Officers") moved to dismiss plaintiffs' claims against them. (Dckt. ##66, 80, 81). Illinois Central School Bus LLC ("Illinois Central") moved to dismiss plaintiffs' claims against it, with the exception of plaintiffs' state law claim for *respondeat superior* (Count XVI).[1] (Dckt. #78). Plaintiffs filed a joint response opposing the motions (Dckt. #95) and defendants thereafter filed replies (Dckt. ##97, 98, 99). For the reasons that follow, the Court grants in part and denies in part defendants' motions.

## I.     LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and the complaint must "permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 679 (2009). When considering a motion to dismiss under Rule 12(b)(6), the Court construes "the complaint in the light most favorable to the [non-moving party] accepting as true all well-pleaded facts and drawing reasonable inferences in [the non-moving party's] favor." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013).

---

[1] Plaintiffs have also brought various claims against the "Illinois Central Individual Defendants" (namely, Shera Bragg, Jordan Brown, and Kinisha Boon). However, these defendants have not filed a motion to dismiss and all claims against them will proceed at this juncture.

2

Nonetheless, "when an exhibit, including a video exhibit, 'incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss.'" *Esco v. City of Chicago*, 107 F.4th 673, 679 (7th Cir. 2024), *quoting Bogle v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013). The Seventh Circuit has held that district courts can consider the body-worn camera ("BWC") footage of a police officer on a motion to dismiss if a plaintiff relies on the footage for allegations within his complaint and it is central to one or more of plaintiff's claims, even if the plaintiff does not attach footage to the complaint. *Esco*, 107 F.4th at 678. To be clear, courts "may not defy the Supreme Court's command to accept all facts in the complaint as true, and instead rely on video evidence unless the video 'utterly discredit[s]' the non-movant's version of the facts such that there could be no reasonable disagreement about what the video depicts." *Id.*, at 679, *quoting Scott v. Harris*, 550 U.S. 372, 380 (2007). The allegations of a complaint are "not plausible" to the extent that they are contradicted by uncontroverted video footage. *Id.*

The parties dispute whether the Court can consider the footage from Officer Hightower's BWC that the Officers submitted in support of their argument that they had probable cause to seize AAB. (*See* Dckt. #84).

The Officers assert that it is "evident that plaintiffs relied upon and utilized portions of Hightower's BWC in their amended complaint" based on (1) plaintiffs' inclusion of certain allegations that are "an exact description of what is depicted on Hightower's BWC" and (2) their assertion that plaintiffs would have had no way to know the content of certain of their allegations unless they relied on the BWC footage. (Dckt. #80 at 5 (citing Complaint ¶¶77, 79, and 84)). The Officers further assert that the Court can rely on the BWC footage because it incontrovertibly contradicts the allegations of the Complaint. (Dckt. #80 at 5–6; Dckt. #97 at 3).

3

Plaintiffs object to the consideration of the BWC footage on the grounds that they did not reference the footage in the Complaint or attach the footage as an exhibit, and they claim that the footage does not contradict their allegations. (Dckt. #95 at 15).

Although plaintiffs did not explicitly reference the BWC footage in their Complaint, they do not deny that the Complaint directly quoted something that Officer Hightower said to the paramedic and accurately described AAB's reaction at the scene (namely, how he was "shrieking and bellowing" so loudly that he could be heard from far away). Without reference to the BWC footage, plaintiffs would have had no basis to know of and accurately allege these facts. Because the BWC footage is central to plaintiffs' claims against the Officers, the Court will consider it.[2]

Moreover, the Court will rely on the BWC footage because it "incontrovertibly contradicts" the allegations of the Complaint in several important respects. In particular, the Complaint alleges: (a) that AAB calmly exited the bus once the Officers arrived, even though the BWC footage clearly shows that AAB pushed past a bus employee (Bragg) and made physical contact with one of the Officers to exit the bus after being repeatedly ordered to stay on the bus, (*compare* Dckt. #60 ¶80 *with* Dckt. #84 at 2:30–52); (b) that AAB fell to the ground after the Officers physically and forcibly tried to get him back on the bus, even though the BWC footage shows that AAB slowly lowered himself to a seated position on the ground once he exited the bus without any action by the Officers, (*compare* Dckt. #60 ¶81 *with* Dckt. #84 at 3:01–10); (c) that the Officers "forcibly handcuffed" AAB, even though the BWC shows that Officer Hightower handcuffed AAB with no resistance, (*compare* Dckt. #60 ¶82 *with* Dckt. #84 at 3:17–27); and (d) that the Officers "callously left Plaintiff AAB in the street with his hands handcuffed

---

[2] The fact that the Officers (and not plaintiffs) submitted the BWC footage to the Court for consideration is of no moment given that the prerequisites for consideration of the footage have been met. *See, e.g.*, *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002).

behind his back," even though the BWC shows that multiple Officers remained with AAB at all times while Officer Hightower investigated AAB's house to see if anyone was home, (*compare* Dckt. #60 ¶84 *with* Dckt. #84 at 6:07–8:50).

## II.   BACKGROUND

The facts below are drawn from the allegations in the Complaint, (Dckt. #60), and Officer Hightower's BWC footage, (Dckt. #84).

### A.  AAB's School and Transportation

During November and December 2022, AAB was a seventeen-year-old student.  (Dckt. #60 ¶1).  He was both non-verbal and autistic, but could understand English and communicated via hand gestures.  (*Id.* ¶¶1, 37).  Due to AAB's disability, he attended Helping Hand Therapeutic Day School and the Board was responsible for transporting AAB to school, which it did via Illinois Central's services.  (*Id.* ¶¶1, 39–40).  The Board instructed AAB's parents, Karen D. and Michael A-B, that the Board would provide bus services and the parents could contact the Board's transportation department if any issues arose.  (*Id.* ¶¶42(a)–(b)).

Beginning no later than October 2022, the Board (through Illinois Central) started requiring AAB to wear a full-torso harness "that harnessed his body to the bus seat."  (*Id.* ¶49).  The harness created pressure on AAB's genitals and caused him pain and discomfort because it had a strap that went between AAB's legs.  (*Id.* ¶50).  Karen D. told Board employees, including McGregor, about the harness's problems, and McGregor made Illinois Central aware of the issue.  (*Id.* ¶51).  Due to the harness causing him pain and discomfort, AAB "sought to unbuckle, and succeed[ed] in unbuckling, the harness while riding the bus in order to sit in a seat without a harness."  (*Id.* ¶53).  According to the Complaint, the Board, Illinois Central, McGregor, and Illinois Central's employees Shera Bragg and Kinisha Boon (together with Jordan Brown the

"Illinois Central Individual Defendants") knew about AAB's efforts to unbuckle himself, but the Board and Illinois Central failed to train them on how to properly address the issue. (*Id.* ¶¶54, 63).

### B. November 30, 2022 Bus Ride

On November 30, 2022, AAB was harnessed in his bus seat and riding to school on a bus operated by Illinois Central, with Brown driving the bus and Boon serving as the bus aide. (*Id.* ¶¶56–57). AAB unbuckled his harness and calmly exited his seat, after which Boon "physically abused Plaintiff AAB, shoving Plaintiff AAB into a seat and then physically and aggressively holding him down." (*Id.* ¶59). Brown, the only other adult on the bus, did not intervene. (*Id.* ¶61). The Illinois Central Individual Defendants were required to prepare incident reports, but Boon and Brown did not prepare one for AAB's November 30, 2022 bus ride. (*Id.* ¶62). Nonetheless, the bus rides were recorded on video, which captured the incident. (*Id.*).

### C. December 19, 2022 Bus Ride

On December 19, 2022, AAB was again riding the bus to school and was harnessed into his seat. (*Id.* ¶64). The bus driver on December 19, 2022 was Brown and the bus aide was Bragg. (*Id.*). During the ride, AAB unbuckled his harness and exited his seat. (*Id.* ¶66). In response, Brown contacted "dispatch," which plaintiffs believe was staffed by McGregor. (*Id.*). McGregor directed Brown to return AAB home—thereby diverting the bus from its route to school— "without first verifying that anyone would be home to take custody of Plaintiff AAB." (*Id.*).

Brown apparently had "disdain" for AAB and his parents, Karen D. and Michael A-B, evidenced by loud comments that Brown made to Bragg both before and after AAB unbuckled his harness, including that (1) Brown and Illinois Central "had been trying to get Plaintiff AAB kicked out of the transportation services"; (2) AAB's parents "could get in trouble for child

6

neglect if they did not come to the door when the bus arrived back at Plaintiff AAB's home"; (2) Karen D. was "probably getting 'benefits'"; and (4) emergency services would be called and AAB's parents would get in trouble if they did not come out of their house to get AAB. (*Id.* ¶¶67–70).

Brown's comments caused AAB "significance distress" and AAB returned to his seat, but he struggled to refasten his harness, and no one came to help him. (*Id.* ¶71). AAB again left his seat "[w]hen it was clear . . . that no one on the bus was going to help him refasten the harness," and hand-signaled to Bragg for help. (*Id.* ¶72). Instead of helping AAB with his harness, Bragg "resorted to physical abuse," and slapped AAB's hands and yelled at him to sit down. (*Id.* ¶72). AAB, "[i]n continued fear and distress," approached the front of the bus, where Bragg pushed and shoved AAB, prompting Brown to instruct Bragg "not to do that," but Bragg did not stop. (*Id.* ¶74).

According to plaintiffs, "[o]n information and belief," McGregor in coordination with defendant Illinois Central and Brown, "determined that it was necessary to involve the police in the situation." (*Id.* ¶75). Plaintiffs further allege that McGregor "did not seek police involvement to protect Plaintiff AAB from the [ ] physical and emotional abuse, but rather to subject Plaintiff AAB to further abuse." (*Id.* ¶75). Plaintiffs fail, however, to allege facts that either expressly state or would permit a plausible inference that McGregor knew that AAB had been subjected to emotional abuse or physical force at the time she made the decision to seek police involvement. To the contrary, the Complaint alleges that (1) two of the Illinois Central Individual Defendants (Brown and Boon) failed to prepare an incident report to cover up their abuse of AAB during the November 30 incident and (2) their verbal and physical abuse of AAB on December 19 began *after* McGregor directed Brown to return AAB to his home. (Dckt. #60

¶¶62, 65–74).  As such, the allegation that McGregor sought police involvement "to subject Plaintiff AAB to further abuse" is implausible speculation that need not be accepted as true on this motion.[3]

### D.  Chicago Police Officers Respond to AAB's Bus on December 19, 2022

The Officers arrived at AAB's home where the bus was waiting in the street.  (*Id.* ¶76). Upon their arrival, the Officers already knew that AAB was a non-verbal autistic child.  (*Id.*). When the Officers walked up to the bus, they saw AAB standing barefoot by Bragg while Brown was seated in the driver's seat.  (*Id.* ¶¶77–78; Dckt. #84 at 2:20).  Bragg informed one of the Officers that AAB "liked to take his shoes off."  (Dckt. #60 ¶79).  Shortly after the Officers arrived, AAB pushed past Bragg and the Officers to exit the bus, while the Officers told him to calm down and that it was cold outside, and attempted to stop him.  (Dckt. #84 at 2:30–52). AAB made physical contact with one or more of the Officers as he pushed past them.  (*Id.*).

AAB then slowly lowered into a seated position, still without shoes, so that he was sitting on the street.  (*Id.* at 3:01–10).  During this time, AAB's hands were visibly trembling.  (*Id.*). The Officers ultimately succeeded in helping AAB back to his feet despite AAB resisting and trying to remain on the ground.  (*Id.* at 3:06–17).  During this interaction, the Officers can be heard trying to communicate with AAB, saying:

- What's going on with you, you are shaking and everything.
- Let's get back on the bus, ok?  Because it's cold out here.
- How's it going?

---

[3] *See, e.g.*, *Emerson v. Dart*, 109 F.4th 936, 941 (7th Cir. 2024), *quoting Twombly*, 550 U.S. at 555 ("The plausibility requirement 'asks for more than a sheer possibility that a defendant has acted unlawfully.' . . . Put simply, a complaint's factual allegations 'must be enough to raise a right to relief above the speculative level.'"); *Alexander v. Philip R. Taft Psy D & Assocs., P.L.L.C.*, 165 F.4th 309, 319 (5th Cir. 2025) ("While complaints do not need detailed allegations, speculative or conclusory statements of fact are insufficient.") (cleaned up); *Holy Bible Missionary Baptist Church v. City of Harvey*, No. 25-CV-3264, 2026 WL 636789, at *3 (N.D.Ill. Mar. 6, 2026) ("To be clear: the complaint must do more than speculate, draw legal conclusions, or add the words 'upon information and belief' before it speculates or draws legal conclusions.").

- What's happening?
- What's your name, baby?
- Are you ok?
- Nice to meet you.
- Its ok, its ok.
- We're not here to hurt you.

(*Id.* at 2:30–3:39). Once standing, Officer Hightower handcuffed AAB's hands behind his back. (*Id.* at 3:17–27). A different Officer then attempted to help put AAB's shoes on him. (*Id.* at 3:35–40). Once standing and handcuffed, AAB began "shrieking and bellowing for minutes on end in a sound loud enough to be heard from far away." (Dckt. #60 ¶84). Although plaintiffs claim that the Officers "callously left Plaintiff AAB in the street," the BWC footage shows multiple Officers stayed with AAB while Officer Hightower investigated AAB's house to see if anyone was home. (Dckt. #84 at 6:07–8:50).

At some point, an ambulance and paramedics arrived, and Officer Hightower went to talk to the paramedics. (Dckt. #60 ¶85). Hightower can be heard telling the paramedics that AAB broke out of his restraints on the bus and that, "[w]hen I got to the bus, he had pushed past and jumped out the bus, started running down the street with no shoes on." (*Id.* ¶87; Dckt. #84 at 7:32–45). Plaintiffs allege that Officer Hightower fabricated this story to make it appear as if there were a psychiatric emergency to justify detaining AAB. (Dckt. #60 ¶88).

Officers remained with AAB in the street until paramedics walked to him with a stretcher. (*Id.* at 6:07–8:50; Dckt. #60 ¶85). According to plaintiffs, the paramedics then "transported Plaintiff AAB against his will" to a hospital for purported agitation, although the hospital ultimately determined that there were no signs of agitation. (Dckt. #60 ¶¶89–90).

None of the Officers were members of the Chicago Police Department's ("CPD") Crisis Intervention Team ("CIT"), a team with specialized training to address situations with mental health issues. (*Id.* ¶91). Therefore, the Officers did not prepare the forms used by CIT officers.

(*Id.*).  According to plaintiffs, it was improper for the Officers to detain AAB, and the Officers should have contacted the Board to arrange for the Board to care for AAB until he could be returned to his parents.  (*Id.* ¶93).

AAB's parents requested video footage for the December 19, 2022 bus ride, among other dates.  (*Id.* ¶94).  The Office of Student Protections ("OSP") ultimately conducted an investigation into AAB's abuse, during which Brown and Bragg "attempted to cover up their unlawful conduct."  (*Id.* ¶96).  In September 2023, allegations of physical abuse against Bragg were "substantiated."  (*Id.* ¶98).

## III.    ANALYSIS

### A.  Fourth Amendment Liberty Deprivation Claim Against the Officers (Count I)

Plaintiffs bring a claim alleging that the Officers deprived AAB of his liberty on December 19, 2022 when they handcuffed and hospitalized him for purported agitation.  While the claim is brought pursuant to the Fourth and Fourteenth Amendments, the parties agree that it is the Fourth Amendment alone that governs mental health seizures.  (Dckt. ##80 at 6; 95 at 13–14).  Pursuant to the Fourth Amendment, "a mental-health seizure is lawful if there is probable cause to believe that the person seized is a danger to herself or others."  *Bruce v. Guernsey*, 777 F.3d 872, 875 (7th Cir. 2015).  The Officers argue that they had probable cause to conduct a mental health seizure of AAB and, alternatively, that they are entitled to qualified immunity because "the law was not clearly well established at the time of the incident such that every reasonable officer would know that the defendant officers' actions were improper."  (Dckt. #80 at 11).

10

### i. Qualified Immunity Standard

"In addition to making out a prima facie claim, a plaintiff suing state officers for monetary damages under §1983 faces an additional hurdle at the motion to dismiss stage. The Supreme Court has made clear that a plaintiff must 'plead[] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Sabo v. Erickson*, 128 F.4th 836, 842 (7th Cir. 2025) (en banc), *quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).[4] "Simply put, a plaintiff can plead himself out of court on qualified immunity grounds," and dismissal based on qualified immunity "is appropriate if, taking the facts alleged in the light most favorable to the plaintiff, the defendant is entitled to qualified immunity as a matter of law." *Sabo*, 128 F.4th at 842–43. Once defendants assert a qualified immunity defense, "the burden shifts to the plaintiff to defeat it," *Villalobos v. Picicco*, 168 F.4th 1057, 1063 (7th Cir. 2026) (cleaned up), and the court has the discretion to determine which element of the defense to address first. *Sabo*, 128 F.4th at 843.

The Court will begin with the second prong, namely, whether the unlawfulness of the Officers' conduct was clearly established at the time. *Villalobos*, 168 F.4th at 1062. In order to meet their burden on this point, plaintiffs "must show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Russell v. Comstock*, 167 F.4th 984, 989 (7th Cir. 2026) (cleaned up); *Villalobos*, 168 F.4th at 1063. "A clearly established right is one that is sufficiently

---

[4] Plaintiffs' argument that it is premature to address qualified immunity, (Dckt. #95 at 26–27), is without merit. "Examining whether defendants are entitled to qualified immunity upon a motion to dismiss . . . comports with the Supreme Court's directive to resolve immunity questions 'at the earliest possible stage in litigation.'" *Sabo*, 128 F.4th at 842, *quoting Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

clear that every reasonable official would have understood that what he is doing violates that right," and "[e]xisting precedent must have placed the statutory or constitutional question beyond debate in order for a right to be clearly established." *Russell*, 167 F.4th at 988 (cleaned up); *Pam v. City of Evansville*, 154 F.4th 523, 530 (7th Cir. 2025) ("Unless no reasonable officer could have thought they were acting lawfully, we must extend immunity.").

Plaintiffs attempt to meet their burden by asserting that "[a]t the time of the Officers' conduct, it was clearly established that police officers cannot arrest or conduct a mental health seizure without probable cause." (Dckt. #95 at 26). While this proposition is correct, it is also patently insufficient to meet plaintiffs' burden. "The Supreme Court has repeatedly instructed us not to define clearly established law at too high a level of generality" because "[d]escribing relevant precedent abstractly evades the crucial question at the core of any qualified immunity analysis: whether the official acted reasonably *in the particular circumstances* that he or she faced." *Sabo*, 128 F.4th at 844 (emphasis added in *Sabo*) (cleaned up). Plaintiffs' statement of the law is thus too general because it does not shed any light on whether the Officers' conduct was unlawful under the factual circumstances here. *See id.* ("Litigants and courts formulate rules of law too generally if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that [the rule] was firmly established.") (cleaned up).

Furthermore, and contrary to plaintiffs' suggestion, (*see* Dckt. #95 at 26–27), it is not the Officers' burden to cite caselaw justifying their action; rather, it is plaintiffs' burden to identify a reasonably analogous case to show that the Officers' conduct was unlawful. Plaintiffs suggest that the decision in *Bruce*, which concerned a mental health seizure by police officers, shows that the Officers are not entitled to qualified immunity. (Dckt. #95 at 14). However, *Bruce*, where one of the defendant officers was denied qualified immunity at the motion to dismiss stage, is

12

factually distinguishable. In that case, the officer "forced a perfectly calm and rational minor, surrounded by several friends and her father, to get in his police car so that she could be taken to the hospital, over the objections of the father, based solely on a report that she was possibly suicidal." *Bruce*, 777 F.3d at 877. Moreover, upon their arrival at the hospital, the officer signed a petition for involuntary judicial admission that included several material falsehoods. *Id*.

The facts here, as pled in the Complaint and established by Officer Hightower's BWC, stand in stark contrast to *Bruce*. To reiterate, the Officers knew that AAB was a non-verbal autistic child when they arrived on the scene; they saw AAB without shoes on the bus and watched him disregard instructions to stay on the bus, push past them, and walk off the bus barefoot in mid-December; they saw him sit on the ground in the street; they tried, without success, to communicate with him; they heard him loudly shrieking and bellowing for minutes on end after they got him on his feet; and they learned that there was no one present at his house to take care for him if they left.

"When the constitutionality of an action depends on the existence of probable cause, the officer must have had 'arguable probable cause' for qualified immunity to attach. *Id.* at 878. "Thus, even when an officer lacks probable cause, he is still entitled to qualified immunity when a reasonable officer could have reasonably believed that probable cause existed in light of well-established law." *Id*. at 878–79 (cleaned up); *Bass v. Dakuras*, No. 19 CV 7557, 2023 WL 5580416, at *4 (N.D.Ill. Aug. 29, 2023) ("In the probable cause context, an officer does not violate clearly established law if he has arguable probable cause, which means 'a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law.'") (cleaned up). The facts as alleged here, at a minimum, provided the Officers with "arguable

13

probable cause." [5] *See, e.g.*, *Turner v. City of Champaign*, 979 F.3d 563, 568–69 (7th Cir. 2020) (officers had probable cause to detain individual for his own safety and that of others after observing him "more disoriented than usual, coupled with [] unintelligible speech and repeated forays into the street"); *Hwang v. Bd. of Educ. for Oak Park and River Forest High Sch. Dist. 200*, No. 24-cv-8939, 2025 WL 2463000, at *1–2, 4–6 (N.D.Ill. Aug. 26, 2025) (granting qualified immunity at motion to dismiss stage to school officials who participated in mental health seizure of autistic plaintiff when she experienced an "episode" at school, leading to her being restrained and hospitalized). [6]

Consequently, because plaintiffs have failed to establish that the unlawfulness of the Officers' conduct was clearly established at the time of their mental health seizure of AAB, the Officers are entitled to qualified immunity on plaintiffs' Fourth Amendment claim. *See Sabo*, 128 F.4th at 840 ("Because Sabo did not allege the violation of a clearly established constitutional right, [defendants] are entitled to qualified immunity as a matter of law" on a motion to dismiss.); *Villalobos*, 168 F.4th at 1063 ("Meeting this burden is a 'do or die' requirement for the plaintiff's suit. If a plaintiff fails to identify analogous precedent clearly establishing the law, the district court must grant summary judgment for the defendant.").

---

[5] Plaintiffs assert that there was a lack of probable cause because Officer Hightower "gave a false oral report to the paramedics to create the false impression that a psychiatric emergency existed" when he stated that AAB "pushed his way off the bus and started running down the street with no shoes on." (Dckt. #95 at 12). However, the only sense in which Officer Hightower's report is inaccurate is that AAB "walked" rather than "ran" in bare feet as he pushed past bus personnel and the Officers to reach the street after ignoring commands to stay on the bus. (*See* Dckt. #84 at 2:30–3:00). This inaccuracy does not defeat the arguable probable cause—created by the totality of the facts discussed above—that existed at the time the Officers effectuated the mental health seizure.

[6] The Court notes that plaintiffs do not try to defeat qualified immunity by arguing that the facts here are "so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 723–24 (7th Cir. 2013).

14

### B. Substantive Due Process Claim (Count II)

Plaintiffs also bring a claim alleging that the individual defendants violated AAB's substantive due process rights under the Fourteenth Amendment. The due process clause is "violated by an infringement of a fundamental right through an abuse of government power that 'shock[s] the conscience.'" *Hess v. Garcia*, 72 F.4th 753, 765 (7th Cir. 2023), *quoting Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992). Plaintiffs must "establish an underlying liberty interest of which [AAB was] deprived in order to prevail under a substantive due process theory." *Wroblewski v. City of Washburn*, 965 F.2d 452, 457 (7th Cir. 1992).

#### i. Plaintiffs' Due Process Claim Against the Officers Is Improper

To begin, plaintiffs' substantive due process claim against the Officers, which alleges that they "unreasonably seized, detained and deprived Plaintiff AAB of his liberty without probable cause, and caused Plaintiff AAB to be unreasonably seized, detained and deprived of his liberty without probable cause," (Dckt. #60 ¶147), cannot survive. This is so because substantive due process "protects people from unconstitutional conduct committed under color of law *when neither a search nor seizure occurs*." *Hess*, 72 F.4th at 764 (emphasis added). Thus, because plaintiffs pursue a Fourth Amendment unreasonable seizure claim against the Officers, they cannot also bring a substantive due process claim premised on the same seizure. *See, e.g.*, *A.G. v. City of Park Ridge*, 198 F.Supp.3d 856, 864 (N.D.Ill. July 27, 2016) ("[W]here a plaintiff premises a Fourth Amendment claim and a substantive due process claim on the exact same conduct, generally speaking the due-process claim cannot go forward.").

#### ii. Plaintiffs' Due Process Claim Against McGregor Is Dismissed

Plaintiffs' substantive due process claim against McGregor must likewise be dismissed. "Substantive due process involves the exercise of governmental power without reasonable

justification," *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005), to infringe on a fundamental right, *Collins*, 503 U.S. at 126. Plaintiffs argue that McGregor infringed on AAB's liberty interest without probable cause. (Dckt. #95 at 17–18). They do not, however, explain how McGregor's limited participation in the incidents at issue infringed on AAB's liberty interests. To recap, the Complaint alleges only that after she was notified that AAB removed his seatbelt and got out of his seat during the December incident, McGregor directed the bus to return to AAB's home without verifying if anyone was there to receive him and decided to involve the police in the situation.[7] Although plaintiffs strongly disagree with how McGregor handled this situation, it is utterly unclear how her alleged actions violated AAB's due process rights.

Furthermore, to establish a substantive due process claim, it is not enough that "the government act be 'incorrect or ill-advised'; it must be 'conscience-shocking.'" *Cox v. Warwick Valley Cent. School Dist.*, 654 F.3d 267, 275 (2d Cir. 2011), *quoting Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995); *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1069 (7th Cir. 2012) ("When a plaintiff brings a §1983 claim under the Due Process Clause, the question is whether an executive abuse of power shocks the conscience.") (cleaned up). "Only 'the most egregious official conduct' suffices to establish conscience-shocking behavior," *Jain v. Butler Sch. Dist. 53*, 303 F.Supp.3d 672, 683 (N.D.Ill. 2018), *quoting Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654-55 (7th Cir. 2011), and McGregor's alleged conduct falls far short of this threshold. *See, e.g.*, *See Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 707–12 (7th Cir. 2002) (no substantive due process claim where student was suspended, sent home alone, and subsequently committed suicide); *K.G. by & through Gosch v. Sergeant Bluff-Luton*

---

[7] Plaintiffs also allege that McGregor involved the police "in order to further AAB's abuse," but the Court has already addressed that speculative allegation and determined that it need not be taken as true for purposes of defendants' motions. *Supra* Section II(C).

*Cmty. Sch. Dist.*, 244 F.Supp.3d 904, 926 (N.D.Iowa 2017) (it did not shock the conscience for special education teacher to drag seven-year-old autistic student across floor, causing severe carpet burns, where teacher believed student posed a potential danger to himself or others). Accordingly, plaintiffs' substantive due process claim will be dismissed.

### C. Equal Protection Claim (Count III)

The Court next turns to plaintiffs' equal protection claim under the Fourteenth Amendment, which alleges that the individual defendants intentionally discriminated against AAB "with a nefarious discriminatory purpose based on his membership in a definable class—namely: (a) he is disabled; and (b) he is a class of one." (Dckt. #60 ¶158). According to plaintiffs, the Officers "did not unlawfully and forcibly seize and detain non-disabled students who calmly exited a bus where the non-disabled students had the ability to verbally inform others of the misconduct," (*id.* ¶162), and McGregor and the Illinois Central Individual Defendants did not "(a) physically abuse non-disabled students who exited their bus seats; (b) refuse to transport non-disabled students to school after the bus was already in route to the school; and (c) cause unlawful seizures and detentions of non-disabled students by providing false information to law enforcement," (*id.* ¶161). Put another way, plaintiffs allege that AAB was seized, detained, and prevented from attending school on December 19, 2022 because he is disabled.

To successfully bring an equal protection claim, a plaintiff must "typically allege that the defendants acted with a nefarious discriminatory purpose and discriminated against him based on his membership in a definable class." *Black as next friend of J.D. v. Littlejohn*, No. 19 C 2585, 2020 WL 469303, at *2 (N.D.Ill. Jan. 28, 2020). Both of AAB's classes—that he is disabled and a "class of one"—are subject to rational basis review. *See Discovery House, Inc. v. Consol. City*

*of Indianapolis*, 319 F.3d 277, 282 (7th Cir. 2003) (disability classification subject to rational basis review); *Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015) (class of one subject to rational basis review). Plaintiffs must therefore also "allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Wroblewski*, 965 F.2d at 460.

The parties do not dispute that AAB is disabled. Plaintiffs assert that the Officers waived any challenge to plaintiffs' equal protection claim based on AAB's membership in a class of disabled persons by instead focusing solely on plaintiffs' class-of-one allegations.[8] (Dckt. #95 at 22). The Court disagrees. As set forth above, both of plaintiffs' equal protection theories are subject to rational basis review and, accordingly, the question before this Court is whether the Complaint alleges "that there is no rational basis for the difference in [AAB's] treatment." *Fares Pawn, LLC v. Ind. Dep't. of Fin. Insts.*, 755 F.3d 839, 845 (7th Cir. 2014); *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013); *see also Scruggs v. Meriden Bd. of Educ.*, No. 3:03cv2224 (PCD), 2006 WL 2715388, at *3–4 (D.Conn. Sept. 22, 2006) ("Because disabled students are not a protected class and there is no fundamental right to education, Plaintiff must make a 'class of one' equal protection claim."). The Court finds that it does.

When evaluating an equal protection claim, a court considers whether "a *conceivable* rational basis for the difference in treatment" exists. *Kopp*, 725 F.3d at 686 (emphasis in original). "Class-of-one claimants carry a heavy burden," *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th

---

[8] Plaintiffs also argue that McGregor waived any challenge to both theories of plaintiffs' equal protection claims (and due process claims) by arguing that plaintiffs failed to adequately allege McGregor's involvement in violating AAB's rights, rather than disputing whether AAB's rights were violated. (Dckt. #95 at 20). Not so. McGregor challenges plaintiffs' equal protection claim against her by arguing that the Complaint is devoid of any allegations that she was personally involved in violating AAB's rights. (*See* Dckt. #67 at 7–8). Because Section 1983 claims require personal involvement, the Court rejects plaintiffs' waiver argument. *See Est. of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017) (individual liability "requires personal involvement in the alleged constitutional deprivation.").

574, 588 (7th 2021), for the rational basis need not even be "the *actual* justification." *Id*. "[A]ny reasonably conceivable state of facts that could provide a *rational basis*" will suffice. *See Scherr v. City of Chicago*, 757 F.3d 593, 598 (7th Cir. 2014) (cleaned up) (emphasis in original).

Plaintiffs recognize that they are required to allege that defendants did not have a rational basis for their treatment of AAB, (Dckt. #95 at 21), but their Complaint fails to pass muster. As detailed above, the Complaint alleges that AAB repeatedly unbuckled himself and stood up *during* his bus rides to school. When the Illinois Central Individual Defendants contacted "dispatch" in response to AAB unbuckling his harness and exiting his seat, McGregor directed them to return AAB home and involve the police. Furthermore, after the Officers arrived on the scene, AAB muscled past them, left the bus barefoot in the middle of December, sat in the street, and "began shrieking and bellowing for minutes on end in a sound loud enough to be heard from far away."

These allegations alone provide a conceivable rational basis to doom plaintiffs' equal protection claims. In particular, it was rational: (1) for McGregor to reroute the bus after hearing that AAB unbuckled himself and exited his seat, creating a safety risk to AAB and all other students and individuals on the bus; (2) to involve the police;[9] and (3) for the Officers to effectuate a mental health seizure when the facts as alleged showed that he might be a danger to himself. To reiterate, the test for rationality does not ask whether the benign justification was the *actual* justification. *See, e.g.*, *Heller v. Doe*, 509 U.S. 312, 320 (1993) (explaining that a classification "must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.") (cleaned up);

---

[9] The Court notes that even plaintiffs concede that it would have been a "reasonable and lawful option" to involve the police (albeit, a CPD Crisis Intervention Team rather than the Officers) in the December incident. (Dckt. #95 at 16).

19

*Miller*, 784 F.3d at 1121–22 ("It is not enough for a complaint to suggest an improper motive, for [a] given action can have a rational basis and be a perfectly logical action for a government entity to take even if there are facts casting it as one taken out of animosity.") (cleaned up).

Accordingly, the Court finds that the Complaint itself alleges an inescapable rational basis for treating AAB differently and plaintiffs' equal protection claim must be dismissed.

### D. Failure to Intervene and Conspiracy (Counts IV and V)

The Court next turns to plaintiffs' federal failure to intervene and conspiracy claims. Because both claims "depend on proof of an underlying constitutional violation," *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 351 (7th Cir. 2019), and plaintiffs have failed to allege that the Officers or McGregor committed an underlying constitutional violation, the failure to intervene and conspiracy claims against them must be dismissed as well. *Id.*

### E. Disability Discrimination Claims (Counts IX and X)

Plaintiffs additionally bring claims against the Board and Illinois Central under Title II of the Americans with Disabilities Act, 42 U.S.C. §12131, *et seq.* and Section 504 of the Rehabilitation Act, 29 U.S.C. §794. The relevant provisions of both Acts are "materially identical," and, as a result, "claims under both require the same analysis." *A.H. by Holzmueller v. Ill. High School Assoc.*, 881 F.3d 587, 592 (7th Cir. 2018) (cleaned up). The Seventh Circuit "ha[s] recognized that disability discrimination under the Rehabilitation Act and the ADA can be established in three different ways: '(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacted disabled people.'" *Id.*, quoting *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999).

20

Plaintiffs pursue the first avenue and allege that Illinois Central and the Board intentionally discriminated against AAB because of his disability.  To succeed on their claims, plaintiffs must show that (1) AAB is a "qualified individual with a disability"; (2) he was denied "the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity," and (3) "that the denial or discrimination was by reason of his disability."[10]  *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (cleaned up).  No party disputes that AAB is a qualified individual with a disability.

Plaintiffs argue that Illinois Central and the Board "intentionally discriminated against AAB based on his disability" through "(a) physical violence; (b) a plot to terminate AAB's bus service; (c) the refusal to provide AAB with a properly fitted harness; and (d) the refusal to transport AAB to school on December 19, 2022." (Dckt. #95 at 38).  Plaintiffs argue that the Board "requested that the CPD assist on December 19, 2022 in order to further abuse AAB."  (*Id.* at 39).  Illinois Central argues that plaintiffs failed to allege "what intentional discrimination Illinois Central engaged in," or otherwise identify "a benefit or program Plaintiff AAB was denied because of his disability," therefore not meeting the second or third elements of the ADA and Rehabilitation Act claims.  (Dckt. #78 at 6–7).  The Board argues that the claims should be dismissed because plaintiffs' allegations are conclusory and "never identify Board conduct that violated either statute."  (Dckt. #67 at 9).

The Court agrees that plaintiffs have failed to adequately plead violations of the ADA or Rehabilitation Act.  Simply put, the Complaint does not explain how the Board or Illinois Central intentionally discriminated against AAB *because* of his disability.  The acts to which plaintiffs

---

[10]  The Rehabilitation Act includes the additional requirement that the public entity receive federal funds. *Wagoner*, 778 at 592.  Neither the Board nor Illinois Central challenge this requirement.

21

point ("physical violence," a "plot to terminate AAB's bus service," the refusal to provide AAB with a properly fitted harness and refusing to transport AAB to school on December 19, 2022) lack a nexus to AAB's disability.

In particular, the Complaint alleges that the Illinois Central Individual Defendants were hired to transport disabled students to school. (Dckt. #60 ¶28). Two of the Illinois Central Individual Defendants used physical force on AAB after AAB unbuckled himself and exited his seat during bus rides to school, on November 30, 2022 and December 19, 2022. Although the Court can reasonably infer that the Illinois Central Individual Defendants used force on AAB in response to AAB unbuckling his harness and exiting his seat, these defendants' wholly inappropriate response to AAB's action does not equate to an allegation that they acted against AAB "*because*" of his disability. After all, the Illinois Central Individual Defendants were tasked with driving disabled students to school every day, yet plaintiffs' allegations of physical abuse are only on days where AAB unbuckled his harness and exited his seat during the bus ride. Similarly, the Illinois Central Individual Defendants' refusal to transport AAB to school on December 19 occurred only *after* he unbuckled his harness and exited his seat.

Courts have recognized that although the ADA and Rehabilitation Act protect disabled persons from adverse action taken against them because of their disability, the statutes do not "erect an impenetrable barrier around the disabled" to protect them from reactions to their conduct even if their conduct is caused by their disability. *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995); *Scott v. City of Albuquerque*, 711 Fed.Appx. 871, 884–85 (10th Cir. 2017) (finding that defendant officer did not arrest disabled plaintiff because he was disabled but that he instead arrested plaintiff because he was interfering with the educational process); *Maples v. Univ. of Texas Med. Branch at Galveston*, 901 F.Supp.2d 874, 883 (S.D.Tex. 2012),

22

*aff'd*, 524 Fed.Appx. 93 (5th Cir. 2013); *Den Hartog v. Wasatch Acad.*, 969 F.Supp. 1393, 1401–02 (D.Utah 1995), *aff'd*, 129 F.3d 1076 (10th Cir. 1997). As such, plaintiffs cannot "bootstrap" AAB's disability "into the line of causation" by showing that his action that triggered the Illinois Central Individual Defendants to assault him was caused by his disability. *Siefken*, 65 F.3d at 666; *Den Hartog*, 969 F.Supp. at 1401–02. "[M]ere 'but for' causation is [in]sufficient under the ADA." *Siefken*, 65 F.3d at 666.

Next, plaintiffs' argument that the Board and Illinois Central intentionally discriminated against AAB by refusing to provide AAB with a properly fitted harness is not pled in the Complaint and first appears in plaintiffs' brief submitted in opposition to defendants' motions to dismiss. Even if this allegation had been properly pled, it would not support plaintiffs' disability claims unless plaintiffs alleged that defendants were aware that AAB's harness did not fit him and they nonetheless refused to provide him with a properly fitting harness because of his disability. Finally, plaintiffs' allegation that defendants "plotted to terminate AAB's bus service" is not actionable because plaintiffs do not allege that defendants actually terminated his bus service. A discriminatory "plot" to terminate a disabled person's access to services does not equate to a denial of service within the meaning of the statutes unless and until service is denied.

In sum: plaintiffs' Complaint at present fails to allege a claim that Illinois Central and the Board intentionally discriminated against him because of his disability.[11] Accordingly, plaintiffs' ADA and Rehabilitation Act claims are dismissed.

---

[11] The Board further argues that it cannot (as a public entity) be held vicariously liable for the conduct of Illinois Central personnel because there "is no vicarious liability under Title II of the ADA or under Section 504." (Dckt. #67 at 9). Although the Seventh Circuit has not directly addressed this issue, the Sixth Circuit along with district courts from this Circuit have adopted the Board's position. *See, e.g.,* *Jones v. City of Detroit, Michigan*, 20 F.4th 1117, 1119–22 (6th Cir. 2021); *Doe v. Bd. of Educ.*, 611 F.Supp.3d 516, 530-31 (N.D.Ill. 2020); *Ravenna v. Vill. of Skokie*, 388 F.Supp.3d 999, 1004–08 (N.D.Ill. 2019); *Royer v. Elkhart City of*, No. 3:22-CV-254 JD, 2022 WL 17600377, at *13–16 (N.D.Ind. Dec. 13, 2022). The Court finds these decisions to be persuasive, and it adopts their holdings on this point.

### F. Monell Claims

Plaintiffs allege three claims pursuant to *Monell v. City of New York*, 436 U.S. 659 (1978), against the Board, the City, and Illinois Central. To state a claim under *Monell*, plaintiffs must demonstrate: "'(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *White v. City of Chicago*, No. 11 CV 7802, 214 WL 958714, at *2 (N.D.Ill. Mar. 12, 2014), *quoting Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009). The policy or practice must be the "direct cause" or "moving force" behind the constitutional violation. *Littlejohn*, 2020 WL 469303, at *6.

Plaintiffs do not identify any express policy and clarify in their opposition brief that they are pursuing *Monell* claims pursuant to a widespread custom and practice, including a failure to train, and pursuant to a constitutional injury caused by a final policymaker. For the following reasons, the Court finds that plaintiffs' *Monell* claims fail.

### i.      Monell Claim Against the City (Count VII)

Plaintiffs' *Monell* claim against the City alleges that the City is liable for violating AAB's constitutional rights "by virtue of its customs, practices and policies—including the failure to train." (Dckt. #60 ¶184). The alleged customs, practices, and policies include "(a) discriminating against, and abusing, disabled persons; (b) covering up and attempting to cover up misconduct; (c) a code of silence; (d) not punishing officers who made false reports; and (e) not properly training, supervising, monitoring and disciplining staff." (*Id.* ¶185).

---

Accordingly, the Board is not vicariously liable to plaintiffs under the ADA and Rehabilitation Act based on the actions of Illinois Central and the Illinois Central Individual Defendants.

24

A *Monell* claim requires a predicate constitutional injury. *Carr v. City of North Chicago*, 908 F.Supp.2d 926, 929–30 (N.D.Ill. 2012) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Here, plaintiffs' claim against the City is wholly contingent on plaintiffs' constitutional claims against the Officers. *See e.g.*, *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007) (municipality cannot be liable under *Monell* when there is no proof of an underlying violation of a plaintiff's constitutional rights by a municipal employee). For reasons explained above, plaintiffs' constitutional claims against the Officers are dismissed and the *Monell* claim against the City must be dismissed as well.

### ii.       Monell Claim Against the Board (Count VI)

Plaintiffs' *Monell* claim against the Board is brought pursuant to three theories of liability: that (1) McGregor was a final policymaker and caused constitutional injuries; (2) the Board failed to train its employees and agents on AAB's harness and not discriminating against or using force against disabled students; and (3) the Board had a custom or practice of promoting and permitting the abuse of and discrimination against disabled students.

In response, the Board argues that (1) plaintiffs have failed to identify an express policy of the Board that resulted in the violation of a constitutional right; (2) plaintiffs have failed to allege that McGregor has final policymaking authority; (3) plaintiffs' failure to train claim fails because they have failed to allege that the Board had notice that its training was deficient in a particular respect such that the Board was deliberately indifferent to the deficiencies of its training; and (4) plaintiffs' allegations are conclusory and allege too few incidents, in summary and vague fashion, to establish municipal liability. The Court agrees on all scores, and it will dismiss plaintiffs' *Monell* claims against the Board.

### a. Plaintiffs have failed to identify an express policy of the Board that has resulted in a constitutional violation

As explained above, plaintiffs have failed to allege any violation of AAB's constitutional rights, let alone one that was caused by an express policy of the Board.

### b. McGregor Is Not a Final Policymaker

"State law informs who legally constitutes a final policymaker." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009); *Walker v. Bd. of Educ. of City of Chi.*, No. 19 CV 4115, 2021 WL 1143517, at *4 (N.D.Ill. Mar. 25, 2021). Final policymaking authority "may be granted directly by statute or delegated or ratified by an official having policymaking authority." *Walker*, 2021 WL 1143517, at *4. In this instance, Illinois law specifies that the Board itself has the power "[t]o approve programs and policies for providing transportation services to students." 105 ILCS 5/34-18(8). The Complaint contains no allegation that the Board delegated final policymaking authority for transportation services to McGregor and plaintiffs' allegation that she is "a decision-maker with final policymaker authority" is a legal conclusion that need not be accepted as true on a motion to dismiss. *Iqbal*, 556 U.S. at 678. Consequently, plaintiffs' *Monell* policymaker theory is not substantiated by the allegations of the Complaint.

### c. Failure to Train

Plaintiffs' failure to train theory is premised on the Board not training its employees and agents to "(a) address the problems caused by AAB's harness; (b) use non-violent means of interacting with disabled students; and (c) not discriminate against disabled students." (Dckt. #95 at 30).

The Supreme Court has held that "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights

may rise to the level of an official government policy for purposes of §1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Nonetheless, "a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id*. To establish *Monell* liability for a municipality's failure to train, a plaintiff must establish deliberate indifference—a "stringent standard," requiring that the municipal actor disregarded "a known or obvious consequence of his action." *Connick*, 563 U.S. at 61, *quoting Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997). Put another way, a state actor's "policy of inaction" is the "functional equivalent of a decision by the [state actor] itself to violate the Constitution." *Connick*, 563 U.S. at 61–62, *quoting City of Canton, Ohio v. Harris*, 489 U.S. 378, 395 (1989).

As the Board has asserted, there can only be deliberate indifference where there is notice of the deficiency of a course of training. *See Connick*, 563 U.S. at 61 ("[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.") (cleaned up). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate a failure to deliberate indifference for purposes of failure to train." *Id.* Plaintiffs do not allege any such pattern here. Moreover, the Complaint does not allege that the Board had any notice of AAB unbuckling himself and being abused as a consequence, or of any discrimination by Illinois Central employees against disabled employees prior to the December 19 incident. To the contrary, the Complaint alleges that the Illinois Central Individual Defendants covered up the November 30 incident when they decided not to prepare an incident report.

Plaintiffs argue that this is a situation where they can establish *Monell* liability through a single violation because they have shown a recurring, obvious risk. (Dckt. #95 at 29). However, the Supreme Court has explained that such a situation could be possible "in a narrow range of

27

circumstances," *Canton*, 489 U.S. at 409, where the "unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under §1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64. The allegations of plaintiffs' Complaint fall far short of alleging this type of situation.

### d. Widespread Custom and Practice

Plaintiffs' final theory of *Monell* liability against the Board is that the Board had a widespread custom and practice "of permitting the abuse of, and discrimination against, disabled students." (Dckt. #95 at 30). "[T]here must be some evidence demonstrating that there is a policy at issue rather than a random event or even a short series of random events." *Bridges v. Dart*, 950 F.3d 476, 479 (7th Cir. 2020) (citing *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 311 (7th Cir. 2010)).

The parties dispute whether plaintiffs alleged sufficient incidents to establish a widespread custom or practice. Plaintiffs provide allegations of four incidents where students with disabilities experienced physical abuse from teachers, principals, deans, or other students. (Dckt. #60 ¶¶125–28). The four incidents are based on uncited lawsuits without case numbers. The Board argues that four incidents are not enough, whereas plaintiffs state they "are not required to allege a specific number of incidents." (Dckt. #95 at 31).

There is no "bright-line rule[]," for exactly how many incidents plaintiffs must allege. *See Thomas*, 604 F.3d at 303. The incidents "do not need to be identical," but "need to be similar to the situation at hand," and "[t]he greater the dissimilarity, the greater the skepticism that there is a single actionable municipal practice or custom." *Hamilton v. Oswego Cmty. Unit Sch. Dist. 308*, No. 20 C 0292, 2021 WL 767619, at *10 (N.D.Ill. Feb. 26, 2021). Plaintiffs' four incidents are as follows:

28

- A 2016 lawsuit involving a nine-year-old special education student that was physically attacked by his teacher, strangled, and dragged down the stairs. (Dckt. #60 ¶125);

- A 2018 lawsuit where a nine-year-old special education student was physically attacked and choked by the dean of students. (*Id.* ¶126);

- A 2019 lawsuit involving an eleven-year-old special-needs student who attempted suicide due to bullying from teachers and students. (*Id.* ¶127); and

- A 2023 lawsuit alleging a teacher and principal physically and mentally abused students with developmental and physical disabilities by hitting them with rulers and threatening them with physical harm. (*Id.* ¶128).

The allegations against the Board and the other defendants are not similar to the four lawsuits to which plaintiffs cite. Notably, none of the four lawsuits involve allegations of discrimination or abuse by bus employees or police officers. Nor do they involve allegations that schools or Board employees committed constitutional violations by calling the police or not transporting a student to school. The Court cannot make a reasonable inference that the Board maintained a widespread custom or practice to promote abuse or discrimination against disabled students based on these four dissimilar incidents. Furthermore, plaintiffs fail to indicate what occurred in the cited lawsuits beyond one resulting in a teacher pleading guilty to battery. *See Bethune v. Westchester Cnty.*, No. 18-CV-3500 (NSR), 2020 WL 1032508, at *5 (S.D.N.Y. Mar. 2, 2020) (granting motion to dismiss plaintiff's *Monell* claim after finding that the "mere citations to lawsuits, even if they did involve comparable conduct, do not alone establish a custom or practice that is widespread and persistent, particularly if the lawsuits did not result in an adjudication of liability.").

In sum: because plaintiffs have not successfully alleged any theory of *Monell* liability, the Court dismisses their claim against the Board.

29

### iii.    Monell Claim Against Illinois Central (Count VIII)

Plaintiffs' *Monell* claim against Illinois Central alleges that it is liable for violating AAB's constitutional rights based on its failure to train employees and because of its customs, practices and policies.  (Dckt. #60 ¶¶189–94).  Illinois Central argues that the claim against it fails because plaintiffs' allegations are conclusory and plaintiffs do not allege a series of incidents to evidence a widespread custom.  (Dckt. #78 at 3–4).

The Court need not reach Illinois Central's arguments, though, because plaintiffs' claim fails for a separate reason: plaintiffs cannot bring a *Monell* claim against a private party.  "The ultimate issue in determining whether a [party] is subject to suit under §1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'"  *Rendell-Baker v. Kohn*, 457 U.S. 830, 837 (1982), *quoting United States v. Price*, 383 U.S. 787, 794 n.7 (1966); *see also Boykin v. Van Buren Twp.*, 479 F.3d 444, 451 (6th Cir. 2007) (for a §1983 claim, plaintiff must show the deprivation of a right caused by a person acting under color of state law).  While the Board is a state actor, the same cannot be said for Illinois Central.  "If the action of the [defendant] is not state action, our inquiry ends."  *Rendell-Baker*, 457 U.S. at 840.

According to plaintiffs, the Board had a federal obligation to provide transportation services to students with disabilities and used Illinois Central to provide those services.  (Dckt. #60 ¶28).  Therefore, again, according to plaintiffs, Illinois Central "performed a function that traditionally and legally was the exclusive prerogative of Defendant Board," placing them in a "symbiotic relationship wherein Defendant Board benefitted from Defendant Illinois Central keeping its costs down, such as by hiring incompetent and unqualified staff."  (*Id.* ¶¶32–33).  Plaintiffs also allege there "was a sufficiently close nexus between Defendant Central and

30

Defendant Board, given that Defendant Board was responsible for Defendant Illinois Central's compliance with federal statutory requirements, for Illinois Central to be deemed a state actor." (*Id.* ¶34).

There are several tests to determine whether a private actor's conduct can be attributed to the state. Based on the Complaint, plaintiffs are pursuing two theories to allege Illinois Central's purported status as a state actor: that it assumed a traditional public function and that it had a symbiotic relationship[12] with the Board.

### a. Public Function

In order to show that Illinois Central is performing a "public function" sufficient to trigger Section 1983 liability, plaintiffs "must show more than the mere performance of a public function by a private entity; she must show that the function is one *exclusively* reserved to the State." *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 19 (1st Cir. 1999).

"The mere fact that [Illinois Central] entered into a contract with the Department to transport public school students does not alter their status." *Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011). Municipalities are free to contract with private parties—and frequently do so. Multiple courts have found that school transportation is *not* an exclusively public function. In *Stillwell v. Mayflower Contract Services, Inc.*, No. 94 C 7253, 1995 WL 368898, at *3 (N.D.Ill. June 19, 1995), the court dismissed Section 1983 claims against a school bus company and found that, "[a]lthough it is true that school districts have a duty to provide transportation, it does not follow that providing transportation to students is traditionally the exclusive prerogative of the state." *See id.* ("A private person does not become a state actor merely by performing a function which serves the public."); *Shields v. Property Management One, Ltd.*, No. 02 C 3712,

---

[12] The "symbiotic relationship" test is also referred to as the "nexus" or "joint action" test. *See Santiago v. Puerto Rico*, 655 F.3d 61, 71 n.6 (1st Cir. 2011).

2003 WL 21877641, at \*5 (N.D.Ill. Aug. 7, 2003) (same); *Hamlin ex rel. Hamlin v. City of Peekskill Bd. of Educ.*, 377 F.Supp.2d 379, 384 (S.D.N.Y. 2005) ("The mere fact that a private party fulfills the school district's obligation to provide transportation to school children does not convert the conduct of these parties into state action.").

In *Santiago*, the First Circuit declined to find that a bus company that transported special education students was a state actor, and explained that "[n]ot surprisingly, the activities that have been held to fall within the state's exclusive preserve for purposes of the function test are few and far between," and include "the administration of elections, the operation of a company town, eminent domain, peremptory challenges in jury selection, and, in at least limited circumstances, the operation of a municipal part." 655 F.3d at 69 (cleaned up). The court also rejected the plaintiff's argument that the bus company was a state actor by virtue of it transporting special education students who have a statutory entitlement to receive education-related services, noting that "[t]he relevant inquiry looks to the *nature* of the service provided, not its beneficiary." *Id.* (emphasis in original); *see also Black v. Indiana Area Sch. Dist.*, 985 F.2d 707 (3d Cir. 1993) ("a state contractor and its employees are not state actors simply because they are carrying out a state sponsored program and the contractor is being compensated therefor by the state."); *Hamlin*, 377 F.Supp.2d at 384 ("Providing transportation to students is not and never has been the *exclusive* prerogative of the State.").

For these reasons, the Court finds that plaintiffs have failed to allege that Illinois Central was performing a function exclusively reserved to the State.

### b. Symbiotic Relationship

Under the "symbiotic relationship" test, state action may be found if "[t]he State has so far insinuated itself into a position of interdependence with [the private entity] that it must be

recognized as a joint participant in the challenged activity." *Shields v. Prop. Mgmt. One, Ltd.*, No. 02cv3712, 2003 WL 21877641, at *4 (N.D.Ill. Aug. 7, 2003), *quoting Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722 (1961). The "requisite nexus is premised on a showing of mutual interdependence." *Santiago*, 655 F.3d at 71.

To reiterate, the Complaint alleges that Illinois Central and the Board shared a "symbiotic relationship" because the Board benefited from Illinois Central keeping costs down, such as by hiring incompetent and unqualified staff. (Dckt. #60 ¶¶32–33). The Complaint alleges that the defendants share a "sufficiently close nexus" insofar that the Board "was responsible" for Illinois Central's "compliance with federal statutory requirements," (*id.* ¶34). These allegations are insufficient to deem Illinois Central a state actor.

The fact that the Board potentially benefited from not having to hire its own staff is "not different than that of many contractors performing services for the government." *Rendell-Baker*, 457 U.S. at 842. And it matters not that Illinois Central was required to abide by federal statutory requirements under the parties' contract because "[w]hile the contract between [the private party] and the [Board] requires [the private party] to abide by federal, state and local law pertaining to the employment of bus monitors, that does not convert the private bus company into a state actor." *Hamlin ex rel.*, 377 F.Supp.2d at 384; *see also Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974) ("The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State."). In light of the foregoing, Illinois Central was not acting under color of state law and is not subject to claims under Section 1983. Consequently, the Court thus dismisses the *Monell* claim against it.

33

**H. State Law Claims**

Plaintiffs' remaining claims arise under state law. Plaintiffs bring a state law claim for intentional infliction of emotional Distress ("IIED") against McGregor, the Officers, and the Illinois Central Individual Defendants (Count XI), "willful and wanton supervision" against the Board, Illinois Central, and McGregor (Count XII), conspiracy against McGregor, the Officers, and the Illinois Central Individual Defendants (Count XIII), *respondeat superior* against the Board (Count XIV), the City (Count XV), and Illinois Central (XVI), and indemnification against the Board (Count XVII), and the City (Count XVIII).

> **i. Plaintiffs' State Law Claims Against the Board, McGregor, the Officers, and the City are Time-Barred to the Extent they are Brought on Behalf of AAB's Parents but are not Time-Barred to the Extent they are Brought on Behalf of AAB.**

Plaintiffs filed their claims on November 27, 2024 related to AAB's bus rides from November and December 2022. (Dckt. #1). There is a one-year statute of limitations for civil actions against a local public entity or a local public employee. 745 ILCS 10/8-101(a). The Board and the City are local public entities, and McGregor and the Officers are employees of those local public entities. Under 735 ILCS 5/13-211, a plaintiff who is either a minor or is living with a disability "may bring the action within 2 years after the person attains the age of 18 years, or the disability is removed." Here, Karen D. and Michael A-B. are suing defendants "individually and as plenary co-guardians of the person of AAB, a disabled person," (Dckt. #60).

To the extent Karen D. and Michael A-B are asserting any individual state law claims on *their own behalf* against the Board, McGregor, the Officers, and the City, those claims are time-barred. *See Fess v. Parke, Davis & Co.*, 446 N.E.2d 1255, 1256–57 (Ill.App.Ct. 1983) ("[T]he [statute of limitations] clause applies only to a person who is under 18 years [or disabled] at the

34

time that the cause of action accrued and only that person may bring an action within two years . . . The parents, as adults, are quite capable of bringing suit on their own behalf.").

However, to the extent that Karen D. and Michael A-B are asserting state law claims on behalf of AAB, defendants' motions to dismiss those claims as time-barred are denied. As plaintiffs argue, tolling due to a disability terminates only upon the occurrence of one of two events: (1) the death of the disabled person or (2) the removal of the disability. *Zayed v. Clark Manor Convalescent Center, Inc.*, 141 N.E.3d 767, 772 (Ill.App.Ct. 2019). AAB is living and his disability has not otherwise been removed. Accordingly, the Court will not dismiss any claims brought on his behalf as time-barred at this time. *See Gavlin v. Adventist Bolingbrook Hosp.*, 196 N.E.3d 1141, 1150 (Ill.App.Ct. 2022); *Mickiewicz v. Generations at Regency, LLC*, 160 N.E.3d 130, 133 (Ill.App.Ct 2019). Indeed, any resolution of defendants' statute of limitations defense as to *AAB's* claims is better left for a later stage.

Notwithstanding any issues related to the statute of limitations, and to the extent plaintiffs assert state law claims on behalf of AAB, as opposed to only individually, the Court turns to the parties' remaining arguments as to the merits of those claims.[13]

### ii. Plaintiffs Fail to State a Claim for IIED against McGregor.

To state a claim for intentional infliction of emotional distress under Illinois law, "a plaintiff must allege facts establishing: (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by plaintiff was severe; and (3) that defendant's conduct was such that defendant knew that severe emotional distress would be certain or substantially certain to result." *Davis v. Pete's Fresh Mkt. 4700 Corp.*, No. 23-CV-

---

[13] Notably, the Officers do not offer additional defenses to plaintiffs' state law claims beyond the statute of limitations and the City simply asserts that the state law claims against it must fall because they fall against the Officers. Similarly, McGregor does not assert any additional defenses to plaintiffs' claim for willful and wanton supervision.

35

14160, 2025 WL 672923, at *8 (N.D.Ill. Mar. 3, 2025), *quoting Heying v. Simonaitis*, 466 N.E.2d 1137, 1143 (Ill.App.Ct. 1984). Illinois sets a "high bar" for intentional infliction of emotional distress claims. *Richards v. U.S. Steel*, 869 F.3d 557, 566 (7th Cir. 2017). To qualify as outrageous, the conduct "must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society." *Id.* (cleaned up). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not suffice. *Id.*

Here, plaintiff has failed to plead a plausible claim for IIED against McGregor. Again, plaintiffs' allegations of McGregor's conduct consist of the following: (1) McGregor directed Brown to return AAB home—thereby diverting the bus from its route to school—"without first verifying that anyone would be home to take custody of Plaintiff AAB; and (2) "[o]n information and belief," McGregor, among others, "determined that it was necessary to involve the police in the situation." (Dckt. #60 ¶¶66, 75). These allegations are simply insufficient to state a plausible claim that meets Illinois' "high bar" for claims of IIED. In fact, McGregor's conduct in the situation appears to fall *within* the bounds of decency as opposed to *beyond*. Accordingly, plaintiffs' state law claim for IIED against McGregor is dismissed.

### iii. Plaintiffs Fail to State a Claim for Conspiracy against McGregor, the Officers, and the Illinois Central Individual Defendants.

"Civil conspiracy is defined as a combination of two or more persons for the purpose of accomplishing, by some concerted action, either an unlawful purpose or a lawful purpose by unlawful means." *Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1053 (Ill. 2020). To state a claim for civil conspiracy, a plaintiff must allege "(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff." *Borsellino v. Goldman Sachs Grp., Inc.*, 477

36

F.3d 502, 509 (7th Cir. 2007) (citing *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999)).

Here, plaintiffs have failed to plead a plausible state law claim for conspiracy against McGregor, the Officers, and the Illinois Central Individual Defendants. As McGregor argues, plaintiffs' claim for civil conspiracy simply regurgitates the requirements of the claim, without offering facts to support it. (*See* Dckt. #60 ¶224 ("As more fully described in the preceding paragraphs, the Individual Defendants acting in concert with other known and unknown conspirators, conspired by concerted action to intentionally inflict severe emotional distress on Plaintiffs") & ¶225 ("In furtherance of the conspiracy, the Individual Defendants committed the overt acts set forth above.")). This is insufficient to state a claim on the record before the Court. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"); *see also McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) ("Making the plausibility determination is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.") (cleaned up). Accordingly, plaintiffs' state law claims for conspiracy against McGregor, the Officers, and the Illinois Central Individual Defendant are dismissed.

### iv. The State Law Claims Against Illinois Central for Willful and Wanton Supervision and Respondeat Superior May Proceed

To state a claim for willful and wanton supervision, plaintiffs must demonstrate that Illinois Central acted "with the intention to cause harm or in a manner that showed an utter indifference to or conscious disregard for the safety of others." *McDonald v. Camarillo*, No. 10cv1233, 2010 WL 4483314, at *1 (N.D.Ill. Nov. 1, 2010). Conscious disregard may be shown via allegations that Illinois Central "knew or should have known its employee[s] behaved in a dangerous or otherwise incompetent manner and failed to exercise ordinary care to prevent the

behavior." *Id.* By alleging that the Illinois Central Individual Defendants used physical force against AAB and that the incidents were videotaped, plaintiffs have adequately alleged that Illinois Central knew or should have known that its employees behaved in a dangerous or otherwise incompetent manner. The Court will not dismiss the claim at this juncture.

### v. The State Law Claim Against Illinois Central Individual Defendants for IIED May Proceed

As discussed above, the Illinois Central Individual Defendants did not move to dismiss the claims against them and therefore the remaining properly pled state law claim naming them (IIED) may proceed to the extent it is not otherwise time-barred.

### vi. The Remaining State Law Claims Survive

Finally, in light of the foregoing rulings regarding plaintiffs' state law claims, plaintiffs' claims for *respondeat superior* against the Board (Count XIV), the City (Count XV), and Illinois Central (XVI), and indemnification against the Board (Count XVII), and the City (Count XVIII) survive the defendants' motions to dismiss.

### CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part the Board and McGregor's motion to dismiss (Dckt. #66), the Officers' motion to dismiss (Dckt. #80), the City's motion to dismiss (Dckt. #81), and Illinois Central's motion to dismiss (Dckt. #78). Plaintiffs are granted until April 21, 2026 to file a second amended complaint to the extent they can do so consistent with this Opinion and the dictates of Federal Rule of Civil Procedure 11.

**DATE: March 31, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**